1
2
3
4
5
6
7

8                        UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   LEONARD P. RODRIGUEZ,                  No.  1:16-cv-00180-JLT (HC)

12                 Petitioner,              **ORDER DENYING PETITION FOR WRIT
                                            OF HABEAS CORPUS**
13        v.
                                            **ORDER DECLINING TO ISSUE
14   SHAWN HATTON, Warden,                  CERTIFICATE OF APPEALABILITY**

15                 Respondent.              **ORDER DIRECTING CLERK OF COURT
                                            TO ENTER JUDGMENT AND CLOSE
16                                          CASE**

17

18        Petitioner is currently in the custody of the California Department of Corrections and

19   Rehabilitation serving an 8 year sentence for his 2013 conviction of inflicting corporal injury,

20   false imprisonment by violence, dissuading a witness, and second degree robbery.  In this action,

21   Petitioner claims: 1) There was insufficient evidence that the victim suffered a corporal injury

22   that resulted in a traumatic condition; 2) Petitioner was prejudiced by the admission of evidence;

23   3) The conviction was obtained by use of perjured testimony by the prosecution; and 4) Defense

24   counsel rendered ineffective assistance.  The Court disagrees and will **DENY** the petition.

25   **I.        PROCEDURAL HISTORY**

26        Petitioner was convicted in the Fresno County Superior Court on January 18, 2013, of

27   inflicting corporal injury (Cal. Penal Code § 273.5(a)), false imprisonment by violence (Cal.

28   Penal Code § 236), dissuading a witness by force or threat (Cal. Penal Code § 136.1(c)(1)), and

                                            1

second degree robbery (Cal. Penal Code § 211).  People v. Rodriguez, 2014 WL 4723434, *1 (Cal. Ct. App. 2014).  He was sentenced to a total determinate term of eight years.  Id.

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA").  The Fifth DCA affirmed the judgment on September 23, 2014.  Id.  Petitioner then filed a petition for review in the California Supreme Court.  The petition was summarily denied on December 10, 2014.  (LD[1] 12.)

Petitioner next filed a petition for writ of habeas corpus in Fresno County Superior Court. On March 19, 2015, the petition was denied.  (LD 15.)  He then filed a habeas petition in the Fifth DCA.  That petition was denied on April 23, 2015.  (LD 17.)  Last, he filed a habeas petition in the California Supreme Court, and that petition was denied on December 16, 2015.  (LD 19.)

On February 9, 2016, Petitioner filed this petition for writ of habeas corpus in this Court. (Doc. No. 1).  The parties have consented to the jurisdiction of the Magistrate Judge. Respondent filed an answer on May 10, 2016.  (Doc. No. 16).  Petitioner did not file a traverse.

## II.    FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[2]:

Antoinette Ramirez (a.k.a. Antoinette Garcia) has been a correctional officer for years. She and defendant have two children together. At one point, Ramirez and defendant lived together for several weeks. [Footnote] Ramirez and defendant broke up in March 2012.

*September 3, 2012*

On the morning of September 3, 2012, defendant called Ramirez and asked if she could take him to the store and then to lunch. Ramirez was seven months pregnant at the time. She brought her son along to pick up defendant at Roeding Park, where he lived. [FN.5]

[FN.5] Defendant was homeless at the time.

Around noon, defendant rented a motel room. At some point, Ramirez took her son home and returned to the motel room. That evening, Ramirez took a shower in the motel room. During Ramirez's shower, defendant began accusing her of "being with" someone else. Ramirez believed defendant was intoxicated or impaired in some fashion. Ramirez "didn't want to hear it" so she got out of the shower, got

---

[1] "LD" refers to the documents lodged by Respondent with his answer.

[2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will rely on the Fifth DCA's summary of the facts.  Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

dressed and said she was going home. [FN.6]   Ramirez began gathering her "items" near a sink outside the bathroom. Defendant said, "[Y]ou're not going anywhere, you're staying here." Defendant pushed her into the bathroom. [FN.7] Ramirez said she was calling the police. Defendant told Ramirez, "'You're not gonna do shit, I'm gonna punch you in your stomach, you're not walking out of here.'" Defendant and Ramirez "were struggling in the bathroom" as Ramirez attempted to call the police and defendant tried to take the phone away. Ramirez told defendant to stop. Defendant began "banging" Ramirez's hand on the tub to knock the phone out of her grasp. Her phone fell into the tub. Throughout their "struggle," defendant "constantly" said, "[Y]ou're not going anywhere," or some variation of that phrase. Ramirez pulled out her Taser and tased defendant. Defendant fell to the floor, and Ramirez "took off running out the door."

[FN.6] She told defendant three or four times that she wanted to leave.

[FN.7] Ramirez qualified this testimony saying defendant "[p]retty much" pushed her "[p]retty much" with his chest.

Eventually, defendant came out of the room and ran down stairs towards the motel office where Ramirez was. Ramirez pointed the Taser gun at him, and he ran past the motel room to an exit. Ramirez went back to the hotel room and looked for her cell phone but could not find it. Eventually, a police officer contacted Ramirez at the motel.

At around 9:30 p.m., Officer Cory Hastings began canvassing nearby areas. He was initially unable to locate defendant. At about 1:40 a.m. the next morning, Hastings saw defendant walking on a sidewalk. Defendant saw Hastings and ran into the parking lot of a nearby motel. Hastings found defendant sitting down, apparently trying to hide behind a vehicle. Defendant smelled of alcohol, his speech was slurred, and his eyes were red and watery.

Officer Hastings arrested defendant and searched him. He located a phone in defendant's shorts pocket. Hastings had another officer call Ramirez's number. When he did so, the phone found on defendant rang. Hastings answered the call and was connected to the other officer. At that point, defendant yelled out, "That bitch has my phone, so I took" her phone.

During their struggle in the motel room, defendant had "head butt[ed]" Ramirez four or five times. The "head butts" hurt Ramirez and she "felt it later." Specifically, Ramirez felt a knot on her head, though it was not visible. She did not go to the hospital and returned to work the next day. An officer who responded to the scene did not observe any visible injuries on Ramirez. The motel clerk was asked whether he saw any bruises or cuts on Ramirez, and he answered: "I just seen [*sic*] her crying that's all."

Ramirez wrote a letter stating she did not want to "press charges" against defendant. Ramirez did not want defendant prosecuted because she loved him, he is the father of her children, and he's "a good person" when he is sober.

*Prior Incidents*

April 15, 2010 Incident

Ramirez testified to a prior incident that occurred on April 15, 2010. She and defendant were dating at the time. Defendant came to visit her some time after 9:00 p.m. Defendant, who was intoxicated, wanted to come into Ramirez's home,

but she would not let him. He said he would drink a beer on her porch and then leave. Ramirez eventually checked outside to see if defendant had left. She saw that her vehicle's windshield "had a brick through it," and that her mirrors had been broken.

Ramirez walked down to the street to where defendant's friend lived. Defendant was outside the residence, and Ramirez asked him whether he broke her windshield. Defendant became angry. It looked to Ramirez as if defendant was going to throw something at her so she "took off." Defendant approached her car "like he was gonna throw something" at it. Ramirez "accidentally stepped on the gas trying to get away, and accidentally ran him over." Ramirez was given a citation but no charges were filed in connection with the incident.

February 12, 2011, Incident

On February 12, 2011, an Officer Eloy Escareno was dispatched on reports of a "disturbance with a male who refused to leave the location." When Escareno arrived, Ramirez was upset because defendant had come to her house and was "very belligerent, was drunk, was loud." After at least 10 minutes, a fire engine arrived with its lights and sirens activated. The fire captain told Escareno that they had received a 911 call that a child was having difficulty breathing. Escareno called dispatch to learn what phone number had placed the 911 call. Escareno confirmed with Ramirez that the phone number belonged to defendant. Escareno then used Ramirez's cell phone to call defendant. A male answered and said, "'Ha ha ha, I got you, bitch. Now I'm gonna get you in trouble.'" The male continued to talk and laugh, but Escareno did not recall what the male spoke about. The male then hung up. Escareno waited a couple minutes and called the number again. The male said, "F**k you, bitch, f**k you." Escareno then identified himself as a police officer. The male said Escareno "had nothing on him" and "couldn't do anything to him." The male then said, "F**k you, come get me if you can find me." Escareno was unable to locate defendant.

June 2011 Incidents

On June 1, 2011, Ramirez called 911. An officer responded and Ramirez was given an emergency protective order against defendant.

On June 3, 2011, defendant left several voicemails for Ramirez. In one message, defendant said, "When I catch you, I'm going to f**k you up." In another, defendant said, "I'm a crazy mother f**king [M]exican." Ramirez called law enforcement and had defendant served with a temporary restraining order.

On June 4, 2011, Ramirez again called police because she interpreted certain voicemails from defendant to be threats against her children.

Ramirez was "pretty sure" defendant left further voicemails on her phone around June 19, 2011.

Defendant pled no contest to charges of making criminal threats (Pen. Code, § 422) "in connection with events alleged to have occurred on June 19th, 2011...." Ramirez had not wanted defendant prosecuted.

Sometime around June 2011, [FN.8] Ramirez had video surveillance equipment installed at her home. The system recorded defendant throwing a brick through Ramirez's front window on June 30, 2011. The system also recorded defendant

4

pulling Ramirez's pool sweep out of the water and throwing it over a fence.

> [FN.8] When asked if she installed the video surveillance in June, Ramirez said, "Um, probably, yes."

### February 2012

Ramirez also testified that on a day in February 2012, defendant was watching their son while Ramirez was at work. Ramirez's mother called her at work and said defendant sounded like he had been drinking. Ramirez left work and came home to find beer bottles around the house. She asked defendant to leave, but he did not want to. Ramirez told defendant that she was going to call the police. Defendant left the home, so Ramirez "cancelled with" the police. Ramirez went outside to move her car because she did not want defendant "to go mess up my car." As she was moving her car, defendant approached her angrily and began cussing at her. Ramirez felt threatened so she tased him. Defendant apologized and said he would leave. Ramirez disconnected the Taser prongs, and defendant left.

### April 13, 2012, Incident

On the morning of April 13, 2012, Officer Manuel Robles responded to a report that an adult male was possibly high on methamphetamine. Robles contacted a female on scene who told him that "nothing was going on," and defendant was probably making the calls. Robles went inside the home and confirmed that "there was nothing going on." Ramirez said she wanted to file charges against defendant.

Officer Robles called the number that had made the false emergency call. A male answered the phone and eventually admitted he was "Leonard Rodriguez" (defendant). Robles told him the number had been used to make a false police report and to violate a restraining order. Defendant said he didn't "give a f**k." Defendant also said "he knows that he's in violation for calling the female, but the female calls him, she picks him up" so "he's gonna continue to violate the restraining order if the female wants him around." Defendant said "he's the one that made the false police calls ... to cause problems against the victim because he wanted to see his kid."

### July 2012 Incidents

On July 5, 2012, Ramirez contacted law enforcement because defendant was harassing her at work. Defendant would call Ramirez and curse repeatedly.

On July 14, 2012, officers responded to Ramirez's home on a report of shots fired. Officers arrived with guns drawn. Ramirez told them "there's nothing going on." The officers did "a quick sweep and left."

On July 17, 2012, defendant called 911 saying he was in Ramirez's house tied up in the garage. Officers arrived and Ramirez explained to them that this had "been happening all week."

On July 21, 2012, officers again responded to Ramirez's home. Ramirez testified: "I guess [defendant] was saying my son was smoking and smoking." Later that night, an officer was informed by dispatch that defendant had been located and stopped. The officer went to defendant and observed he was slurring speech, smelled of alcohol, was acting belligerently, and had red eyes and an unsteady gait. The number of a cell phone found on defendant's person matched the number

1   that had been placing the false emergency calls.

2   Defendant was convicted of falsely reporting an emergency (Pen. Code, § 148.3,
    subd. (a)) after pleading no contest.

3

4   *Marriage and Family Therapist*

5   A licensed marriage and family therapist testified as a domestic violence expert for
    the prosecution. The expert explained that victims often minimize what happened
6   to them, alcoholism increases the severity of the abuser's violence and verbal
    assaults, and victims can testify with an emotionless response because they
7   become "numb" in the course of developing "learned helplessness."

8   Rodriguez, 2014 WL 4723434, at *1–4.

9   **III.    DISCUSSION**

10          A.      Jurisdiction

11          Relief by way of a petition for writ of habeas corpus extends to a person in custody

12   pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or

13   treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor,

14   529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as

15   guaranteed by the United States Constitution.  The challenged conviction arises out of the Fresno

16   County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. §

17   2254(a); 28 U.S.C.§ 2241(d).

18          On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

19   1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

20   enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases

21   filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA

22   and is therefore governed by its provisions.

23          B.      Legal Standard of Review

24          A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless

25   the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision

26   that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

27   determined by the Supreme Court of the United States; or (2) resulted in a decision that "was

28   based on an unreasonable determination of  the facts in light of the evidence presented in the State

6

1  court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);

2  Williams, 529 U.S. at 412-413.

3      A state court decision is "contrary to" clearly established federal law "if it applies a rule

4  that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set

5  of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a

6  different result."  Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams, 529 U.S. at 405-

7  406 (2000).

8      In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court

9  explained that an "unreasonable application" of federal law is an objective test that turns on

10  "whether it is possible that fairminded jurists could disagree" that the state court decision meets

11  the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an

12  *unreasonable* application of federal law is different from an *incorrect* application of federal

13  law.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011).  Thus, a state prisoner seeking a

14  writ of habeas corpus from a federal court "must show that the state court's ruling on the claim

15  being presented in federal court was so lacking in justification that there was an error well

16  understood and comprehended in existing law beyond any possibility of fairminded

17  disagreement."  Harrington, 131 S.Ct. at 787-788.

18      The second prong pertains to state court decisions based on factual findings.  Davis v.

19  Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under §

20  2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the

21  petitioner's claims "resulted in a decision that was based on an unreasonable determination of the

22  facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539

23  U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500.  A state court's factual finding is unreasonable

24  when it is "so clearly incorrect that it would not be debatable among reasonable jurists."  Id.; see

25  Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543

26  U.S. 1038 (2004).

27      To determine whether habeas relief is available under § 2254(d), the federal court looks to

28  the last reasoned state court decision as the basis of the state court's decision.  See Ylst v.

7

1  _Nunnemaker_, 501 U.S. 979, 803 (1991); _Robinson v. Ignacio_, 360 F.3d 1044, 1055 (9th Cir.

2  2004).  "[A]lthough we independently review the record, we still defer to the state court's

3  ultimate decisions."   _Pirtle v. Morgan_, 313 F.3d 1160, 1167 (9th Cir. 2002).

4          The prejudicial impact of any constitutional error is assessed by asking whether the error

5  had "a substantial and injurious effect or influence in determining the jury's verdict."  _Brecht v._

6  _Abrahamson_, 507 U.S. 619, 623 (1993); _see also_ _Fry v. Pliler_, 551 U.S. 112, 119-120

7  (2007)(holding that the _Brecht_ standard applies whether or not the state court recognized the error

8  and reviewed it for harmlessness).

9          C.      Review of Claims

10         The instant petition presents the following grounds for relief: 1) There was insufficient

11  evidence that the victim suffered a corporal injury that resulted in a traumatic condition; 2)

12  Petitioner was prejudiced by the admission of evidence; 3) The conviction was obtained by use of

13  perjured testimony by the prosecution; and 4) Defense counsel rendered ineffective assistance.

14         1.      Insufficiency of the Evidence

15                 a.      State Court Opinion

16         Petitioner first alleges the evidence was insufficient to support the finding that he inflicted

17  corporal injury on the victim which resulted in a traumatic condition.  The claim was presented on

18  direct appeal to the Fifth DCA, where it was rejected in a reasoned decision.

19     The appellate court rejected the claim as follows:

20     SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S CONCLUSION THAT
       RAMIREZ SUFFERED A "CORPORAL INJURY RESULTING IN A
21     TRAUMATIC CONDITION"

22     Defendant first contends that there was insufficient evidence that he inflicted a
       corporal injury resulting in a "traumatic condition." (See § 273.5, subds. (a) &
23     (d).) As a result, he requests that we reduce count I to misdemeanor battery.

24         _A.  STANDARD OF REVIEW_

25     "To resolve this issue, we review the whole record in the light most favorable to
       the judgment to decide whether substantial evidence supports the conviction, so
26     that a reasonable jury could find guilt beyond a reasonable doubt. [Citation.]"
       (_People v. Beasley_ (2003) 105 Cal.App.4th 1078, 1085.)

27         _B.  SECTION 273.5_

28     A defendant violates section 273.5 when he or she "willfully inflicts corporal

                                                8

injury resulting in a traumatic condition" upon the "mother or father of the offender's child." (§ 273.5, subds. (a) & (b)(4).) A " 'traumatic condition' means a condition of the body, such as a wound, or external or internal injury ... whether of a minor or serious nature, caused by a physical force." (§ 273.5, subd. (d).)

### C.  ANALYSIS

Defendant submits that because Ramirez's injury was not visible, did not necessitate medical treatment at a hospital or in an ambulance, and was not serious enough to prevent her return to work the next day, it was not a "traumatic condition" under section 273.5.

Any momentary attractiveness to defendant's argument stems from common usage of the term "traumatic." Sometimes, words like "trauma" are used in common parlance to convey a certain level of severity or substantiality to an injury. (See *United States v. Moses* (6th Cir. 1998) 137 F.3d 894, 899 [one common meaning of "trauma" is " 'emotional wound or shock that creates *substantial, lasting damage* ...' " (italics added) ].) Perhaps Ramirez's injuries would not qualify as "traumatic" under that particular usage of the term. But the common usage is irrelevant here, because the operative phrase is statutorily defined. And that definition of "traumatic condition" expressly includes injuries "of a minor ... nature...." [FN.9] (§ 273.5, subd. (d).)

> [FN.9] Defendant argues that to "elevate a knot or a bump on the head to a 'corporal injury resulting in a traumatic condition,' is to demean the English language." But to hold that an injury is too minor to qualify as a traumatic condition would demean the statutory language, which expressly encompasses injuries of "a minor ... nature ...." (§ 273.5, subd. (d).)

Consequently, even though Ramirez's injury was arguably "minor," it nonetheless satisfied the requirements of section 273.5. [FN.10] Ramirez testified that defendant "head butted" her several times. The "head butts" hurt Ramirez, and she "felt it later." Specifically, she felt one knot at the top of her forehead the next day. This constitutes substantial evidence that defendant "willfully inflict[ed] corporal injury resulting in" "a condition of the body, such as ... internal injury ... caused by physical force." (§ 273.5, subds. (a) & (d).)

> [FN.10] Defendant relies almost entirely on *People v. Abrego* (1993) 21 Cal.App.4th 133 in urging a different conclusion. Even assuming *Abrego* was rightly decided, it does not aid defendant here. In *Abrego* there was "no evidence" the victim suffered "even a minor injury sufficient to satisfy the statutory definition." (*Id.* at p. 138.) Here, there was evidence Ramirez did suffer an injury (i.e., one knot on her head).

Our conclusion is not altered by the fact that Ramirez's injury was not seen by the responding police officer or motel clerk. An "internal injury ... caused by physical force" is a "traumatic condition" just as much as an external one. (§ 273.5, subd. (d).) The jury was free to believe Ramirez's testimony that she sustained an internal "injury" to her head even though it was not observed by others. On substantial evidence review, we assume the jury made such an inference and will not disturb the judgment.

Rodriguez, 2014 WL 4723434, at *4–5.

///

1                    b.       Federal Standard

2          The law on sufficiency of the evidence is clearly established by the United States Supreme

3   Court.  Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S.

4   307, the test on habeas review to determine whether a factual finding is fairly supported by the

5   record is as follows: "[W]hether, after viewing the evidence in the light most favorable to the

6   prosecution, any rational trier of fact could have found the essential elements of the crime beyond

7   a reasonable doubt."  Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781

8   (1990).  Thus, only if "no rational trier of fact" could have found proof of guilt beyond a

9   reasonable doubt will a petitioner be entitled to habeas relief.  Jackson, 443 U.S. at 324.

10  Sufficiency claims are judged by the elements defined by state law.  Id. at 324, n. 16.

11         If confronted by a record that supports conflicting inferences, a federal habeas court "must

12  presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any

13  such conflicts in favor of the prosecution, and must defer to that resolution."  Id. at 326.

14  Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a

15  conviction.  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

16         After the enactment of the AEDPA, a federal habeas court must apply the standards of

17  Jackson with an additional layer of deference.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir.

18  2005).  In applying the AEDPA's deferential standard of review, this Court must presume the

19  correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson,

20  477 U.S. 436, 459 (1986).

21         In Cavazos v. Smith, __U.S. __, 132 S.Ct. 2 (2011), the United States Supreme Court

22  further explained the highly deferential standard of review in habeas proceedings, by noting that

23  Jackson,

24         makes clear that it is the responsibility of the jury - not the court - to decide what
           conclusions should be drawn from evidence admitted at trial. A reviewing court
25         may set aside the jury's verdict on the ground of insufficient evidence only if no
           rational trier of fact could have agreed with the jury. What is more, a federal court
26         may not overturn a state court decision rejecting a sufficiency of the evidence
           challenge simply because the federal court disagrees with the state court. The
27         federal court instead may do so only if the state court decision was "objectively
           unreasonable."
28

Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

Id. at 3.

### c.    Analysis

The state court reasonably determined that sufficient evidence supported the elements of the offense.  As noted by the Court, a violation of section 273.5 occurs when the perpetrator "willfully inflicts corporal injury resulting in a traumatic condition."  Cal. Penal Code § 273.5(a),(b)(4).  A "traumatic condition" is defined by the statute as "a condition of the body, such as a wound, or external or internal injury . . . whether of a minor or serious nature, caused by a physical force."  Cal. Penal Code § 273.5(d).  There was evidence that Petitioner repeatedly head-butted the victim.  There was evidence that the victim sustained one or two knots on her head the next morning.  Clearly, these acts met the definition of a physical force causing at least minor internal or external injury.  Therefore, Petitioner fails to show that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  The claim should be denied.

### 2.    Admission of Evidence

### a.    State Court Opinion

Petitioner claims his constitutional rights were violated when the trial court admitted fourteen prior acts of domestic violence involving Petitioner and the victim.  He raised this claim on direct appeal and it was rejected by the Fifth DCA in a reasoned decision as follows:

II. THE ADMISSION OF EVIDENCE REGARDING PRIOR INCIDENTS WAS NOT PREJUDICIAL ERROR

Defendant contends the court erred in admitting evidence of prior incidents involving himself and Ramirez. He offers two lines of argument on this issue. First, he contends that section Evidence Code 11 section 1109, which permits propensity evidence in domestic violence prosecutions, is unconstitutional. Second, he contends that the trial court abused its discretion in failing to exclude the evidence under section 352.

### A.    LAW OF PROPENSITY EVIDENCE IN DOMESTIC VIOLENCE PROSECUTIONS

"Except as provided in ... Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an

11

opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (§ 1101, subd. (a).)

With exceptions not applicable here, section 1109 provides that "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." (§ 1109, subd. (a)(1).)

Under section 1109, "evidence of past domestic violence inadmissible *only* if the court determines that its probative value is 'substantially outweighed' by its prejudicial impact." (*People v. Johnson* (2010) 185 Cal.App.4th 520, 531, italics added, fn. omitted.) In other words, section 1109 renders section 1101 inapplicable in domestic violence cases. However, the evidence must still satisfy section 352.

## B.   SECTION 1109 IS CONSTITUTIONAL

It is at this juncture where defendant's first contention impacts our analysis. He posits that section 1109 is unconstitutional. If we agreed, there would be no operative exception to section 1101 applicable to this case. However, for the reasons explained below, we reject defendant's premise. Consequently, section 1109 remains in effect and operates to exempt the evidence in this case from the reach of section 1101.

### 1.   People v. Falsetta

The Supreme Court's decision in *People v. Falsetta* (1999) 21 Cal.4th 903 (*Falsetta*) is instructive. In *Falsetta*, the high court upheld a similar statute – section 110812—as constitutional. (*Falsetta, supra*, 21 Cal.4th at p. 907.)

Section 1108, subdivision (a) provides: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." (§ 1108, subd. (a).) Thus, section 1108—like section 1109—creates an exception to section 1101.

The *Falsetta* defendant argued that section 1108 "violates due process principles by allowing admission of 'propensity' evidence." (*Falsetta, supra*, 21 Cal.4th at p. 910.) The Supreme Court rejected the constitutional challenge, noting that section 1108 was limited to evidence of prior sex offenses and thus did not permit "far-ranging attacks on the defendant's character." (*Id.* at p. 916.) Moreover, section 1108 "expressly permits trial courts to exclude evidence of other crimes under section 352." (*Falsetta, supra*, at p. 916.) As a result, the Court held that "section 352 save[d] section 1108 from defendant's due process challenge." (*Id.* at p. 917.)

### 2.   Analysis

We see no basis for distinguishing *Falsetta's* reasoning with respect to section 1109. As in *Falsetta*, section 1109 does not permit far-ranging attacks on the defendant's character. (See *Falsetta, supra*, 21 Cal.4th at p. 916.) Rather, it limits its reach to defendant's prior acts of domestic violence in domestic violence prosecutions. (§ 1109, subd. (a).) And, section 1109—like section 1108—expressly permits trial courts to exclude evidence of other crimes under section 352. (See *Falsetta, supra*, 21 Cal.4th at p. 916.) Therefore, we conclude that

section 352 protects section 1109 from defendant's due process challenge. (See *Falsetta* at p. 917; accord, *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1310 [also rejecting equal protection challenge]; *People v. Brown, supra*, 77 Cal.App.4th at pp. 1332–1334; *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1026–1029; *People v. Johnson* (2000) 77 Cal.App.4th 410, 419–420.)

### C. THE TRIAL COURT DID NOT ABUSE ITS DISCRETION UNDER SECTION 352

Defendant next contends that even if section 1109 is constitutional, the trial court nonetheless abused its discretion in admitting the evidence under section 352. Again, we disagree.

Section 352 "requires the exclusion of evidence only when its probative value is *substantially* outweighed by its prejudicial effect...." (*People v. Tran* (2011) 51 Cal.4th 1040, 1047, italics in original.) We review the trial court's ruling under section 352 for abuse of discretion. (*People v. Johnson, supra*, 185 Cal.App.4th at p. 531.)

The Legislature has determined "that in domestic violence cases ... similar prior offenses are 'uniquely probative' of guilt in a later accusation. [Citation.]" (*People v. Johnson, supra*, 185 Cal.App.4th at p. 532.)

> "The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases. Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity...." (*Id*. at p. 532, fn. 8, quoting Assem. Analysis of Sen. Bill 1876, pp. 3–4.)

The prior incidents discussed at trial demonstrate that defendant has, on several occasions, become intoxicated and proceeded to curse at and threaten Ramirez. Some of the incidents further illustrated that defendant's inappropriate conduct often escalated until Ramirez responded with force. There was evidence defendant acted in a similar fashion on September 3, 2012, during the events underlying the present case. [FN.13] Consequently, we conclude the prior incidents were very probative.

> [FN.13] It is true that defendant was able to batter Ramirez on September 3, 2012, but was apparently unable to do so during the prior incidents. But one of the rationales behind section 1109 is the fact that "'[w]ithout the propensity inference, the escalating nature of domestic violence is ... masked.'" (*People v. Johnson, supra*, 185 Cal.App.4th at p. 532, fn. 8.) The evidence that Ramirez stopped defendant before he could make physical contact does not render the prior incidents inadmissible.

Defendant argues the evidence was prejudicial because it "created a jury predisposed to believe that he was the kind of person who would assault Ms. Ramirez." He also posits the evidence was prejudicial because the jury was not instructed to avoid inferring guilt from the prior incidents. But there was no need to instruct the jury not to make propensity inferences because such inferences were permissible. (See *People v. Reyes* (2008) 160 Cal.App.4th 246, 250–253; see also *People v. Pescador* (2004) 119 Cal.App.4th 252, 259–261; cf. *People v. Villatoro, supra*, 54 Cal.4th at pp. 1165–1167 [rejecting a similar instructional claim regarding section 1108].) The court properly instructed the jury that it could

indulge a propensity inference but was not required to. The court also instructed the jury that the evidence of prior incidents of domestic violence "is not sufficient by itself to prove that the defendant is guilty of any of the crimes charged." We therefore reject defendant's claim of instructional error. (See *People v. Reyes*, supra, 160 Cal.App.4th at pp. 250–253.)

To have prevailed under section 352, defendant needed to have demonstrated that the evidence uniquely tended to evoke an emotional bias against him. (See P*eople v. Zepeda* (2008) 167 Cal.App.4th 25, 35.) """"[P]rejudicial" is not synonymous with "damaging" (*ibid*.), and all defendant has shown here is that the evidence presented was damaging.

*Rodriguez*, 2014 WL 4723434, at *5–7.

>            b.      Federal Standard

A federal court in a habeas proceeding does not review questions of state evidence law. Our inquiry is limited to whether the evidence ruling "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). With respect to the admission of evidence, there is no Supreme Court precedent governing a court's discretionary decision to admit evidence as a violation of due process. In *Holley v. Yarborough*, the Ninth Circuit stated:

The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, [Citation omitted.], it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ. Absent such "clearly established Federal law," we cannot conclude that the state court's ruling was an "unreasonable application."   [Citation omitted.] Under the strict standards of AEDPA, we are therefore without power to issue the writ . . . .

*Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009). Since there is no clearly established Supreme Court precedent governing a trial court's discretionary decision to admit evidence as a violation of due process, habeas relief is foreclosed.  Id.  Therefore, Petitioner cannot demonstrate that the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law.  See 28 U.S.C. § 2254(d).  The claim must be denied.

>      3.   Solicitation of Perjured Testimony

>            a.      State Court Opinion

Petitioner next alleges the prosecution obtained a conviction by use of perjured testimony. He presented this claim in his habeas petitions to the state courts.  In the last reasoned decision,

the Fresno County Superior Court denied the claim as follows:

> Petitioner presents three contentions in his petition for writ of habeas corpus. First, Petitioner maintains that he was convicted based on perjured testimony that was introduced by the prosecution.
>
> Initially, the Court notes that Petitioner has failed to attach a proof of service of his petition on the District Attorney of Kings County, where he is currently confined. Consequently, Petitioner has failed to attach a proper proof of service of his petition for writ of habeas corpus. (Pen. Code, § 1475.)
>
> However, even had Petitioner attached a proper proof of service, the Court finds that a petition for writ of habeas corpus must (i) state fully and with particularity the facts on which relief is sought and (ii) include copies of reasonably available documentary evidence supporting the claims presented in the petition. (*People v. Duvall* (1995) 9 Cal.4th 464, 474.) While Petitioner contends that the prosecution introduced false testimony from Antoinette Ramirez that his "girlfriend fabricated this event out of fear because she tazed Petitioner to unconsciousness with injury," he has failed to adequately explain what testimony Antoinette presented that was allegedly false and how that testimony purportedly prejudiced his defense.
>
> Moreover, Petitioner has failed to present a reasonable justification for his failure to raise this issue on appeal.
>
>> The general rule is that habeas corpus cannot serve as a substitute for an appeal, and, in the absence of special circumstances constituting an excuse for failure to employ that remedy, the writ will not lie where the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction.
>
> (*In re Dixon* (1953) 41 Cal.2d 756, 759; see *In re Harris* (1993) 5 Cal.4th 813, 829.) As Petitioner has failed to adequately specify the facts on which his first contention are based or explained his failure to raise it on appeal, the Court finds that Petitioner has failed to present a viable claim for habeas corpus relief with respect to his first contention.

(LD 15 at pp.1-2.)

        **b.**   <u>Procedural Default</u>

Respondent contends that the state court's imposition of a procedural bar forecloses federal review of the claim. The Court agrees.

State courts may decline to review a claim based on a procedural default. <u>Wainwright v. Sykes</u>, 433 U.S. 72, 86–87 (1977). In turn, federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." <u>Coleman v. Thompson</u>, 501 U.S. 722, 729 (1991); <u>LaCrosse v. Kernan</u>, 244 F.3d 702, 704 (9th Cir. 2001); see <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 801 (1991); <u>Park v. California</u>, 202 F.3d 1146, 1150

1   (2000) ("A district court properly refuses to reach the merits of a habeas petition if the petitioner

2   has defaulted on the particular state's procedural requirements . . . ."). This concept has been

3   commonly referred to as the procedural default doctrine. This doctrine of procedural default is

4   based on concerns of comity and federalism. Coleman, 501 U.S. at 730-32. If the court finds an

5   independent and adequate state procedural ground, "federal habeas review is barred unless the

6   prisoner can demonstrate cause for the procedural default and actual prejudice, or demonstrate

7   that the failure to consider the claims will result in a fundamental miscarriage of justice." Noltie

8   v. Peterson, 9 F.3d 802, 804-805 (9th Cir. 1993); Coleman, 501 U.S. at 750; Park, 202 F.3d at

9   1150.

10      The mere occurrence, however, of a procedural default will not necessarily bar a federal

11   court from reviewing claims in a petition for writ of habeas corpus. In order for the procedural

12   default doctrine to apply and thereby bar federal review, the state court determination of default

13   must be grounded in state law that is both adequate to support the judgment and independent of

14   federal law. Ylst, 501 U.S. at 801; Coleman, 501 U.S. at 729-30. Put another way, the

15   procedural default doctrine will apply only if the application of the state procedural rule provides

16   "an adequate and independent state law basis" on which the state court can deny relief. Park, 202

17   F.3d at 1151 (quoting Coleman, 501 U.S. at 729-30).

18      "For a state procedural rule to be 'independent,' the state law basis for the decision must

19   not be interwoven with federal law." LaCrosse, 244 F.3d at 704 (citing Michigan v. Long, 463

20   U.S. 1032, 1040-41 (1983)); Morales v. Calderon, 85 F.3d 1387, 1393 (9th Cir. 1996) ("Federal

21   habeas review is not barred if the state decision 'fairly appears to rest primarily on federal law, or

22   to be interwoven with federal law.'" (quoting Coleman, 501 U.S. at 735). "A state law is so

23   interwoven if 'the state has made application of the procedural bar depend on an antecedent ruling

24   on federal law [such as] the determination of whether federal constitutional error has been

25   committed.'" Park, 202 F.3d at 1152 (quoting Ake v. Oklahoma, 470 U.S. 68, 75 (1985)).

26      To be deemed adequate, the state law ground for decision must be well-established and

27   consistently applied. Poland v. Stewart, 169 F.3d 573, 577 (9th Cir. 1999) ("A state procedural

28   rule constitutes an adequate bar to federal court review if it was 'firmly established and regularly

16

1    followed' at the time it was applied by the state court.") (quoting <u>Ford v. Georgia</u>, 498 U.S. 411,

2    424 (1991)).  Although a state court's exercise of judicial discretion will not necessarily render a

3    rule inadequate, the discretion must entail "'the exercise of judgment according to standards that,

4    at least over time, can become known and understood within reasonable operating limits.'"  <u>Id</u>. at

5    377 (quoting <u>Morales</u>, 85 F.3d at 1392).

6         <u>In re Dixon</u> refers to California's procedural rule which provides that a California court, in

7    a habeas corpus proceeding, will not review the merits of a claim if that claim could have been

8    raised in a timely appeal but was not.  <u>In re Dixon</u>, 41 Cal.2d at 759 ("[I]n the absence of special

9    circumstances constituting an excuse for failure to employ [the] remedy [of direct review], the

10   writ will not lie where the claimed errors could have been, but were not, raised upon a timely

11   appeal from a judgment of conviction").  <u>See</u> <u>In re Harris</u>, 5 Cal.4th 813, 823 (1993) (explaining

12   <u>Dixon</u> rule).  Since the California Supreme Court's 1998 decision in <u>In re Robbins</u>, 18 Cal.4th

13   770, 811-812 & n. 32 (1998), the <u>Dixon</u> rule has been independent of federal law.  <u>Park</u>, 202 F.3d

14   at 1152.  Since the California Supreme Court's 1993 decisions in <u>In re Harris</u>, 5 Cal.4th 813, 823

15   (1993) and <u>In re Clark</u>, 5 Cal.4th 750 (1993), the <u>Dixon</u> rule has been consistently applied, i.e.,

16   "adequate."  <u>Park</u>, 202 F.3d at 1152.  Hence, any state court ruling procedurally barring a habeas

17   claim because the petition failed to raise that claim in his direct appeal, i.e., the <u>Dixon</u> rule, will

18   be barred on federal habeas review unless the petitioner can demonstrate (1) cause for the default

19   and actual prejudice resulting from the alleged violation of federal law, or (2) a fundamental

20   miscarriage of justice.  <u>Harris v. Reed</u>, 489 U.S. 255, 262-263 (1989); <u>Coleman</u>, 501 U.S. at 750.

21       In this case, the state court imposed the <u>Dixon</u> procedural bar.  At the time the bar was

22   imposed, the rule was both adequate and independent of federal law.  Petitioner fails to establish

23   cause and prejudice, or that a fundamental miscarriage of justice occurred.  Therefore, the claim

24   is procedurally defaulted.

25            c.    <u>Analysis</u>

26       In any case, the claim is without merit.  A petitioner is entitled to habeas corpus relief if

27   the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting

28   conviction a denial of due process."  <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643 (1974).  To

17

1    constitute a due process violation, the prosecutorial misconduct must be "of sufficient

2    significance to result in the denial of the defendant's right to a fair trial." Greer v. Miller, 485

3    U.S. 756, 765 (1987) (quoting United States v. Bagley, 473 U.S. 667 (1985)). Any claim of

4    prosecutorial misconduct must be reviewed within the context of the entire trial. Id. at 765-66;

5    United States v. Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1994). The court must keep in mind

6    that "[t]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the

7    fairness of the trial, not the culpability of the prosecutor" and "the aim of due process is not

8    punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the

9    accused." Smith v. Phillips, 455 U.S. 209, 219 (1982). If prosecutorial misconduct is

10   established, and it was constitutional error, the error must be evaluated pursuant to the harmless

11   error test set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993). See Thompson, 74 F.3d at

12   1577 (Only if constitutional error is established "would we have to decide whether the

13   constitutional error was harmless.").

14          The knowing use of false or perjured testimony against a defendant to obtain a conviction

15   is unconstitutional. Napue v. Illinois, 360 U.S. 264 (1959). In Napue, the Supreme Court held

16   that the knowing use of false testimony to obtain a conviction violates due process regardless of

17   whether the prosecutor solicited the false testimony or merely allowed it to go uncorrected when

18   it appeared. Id. at 269. The Court explained that the principle that a State may not knowingly use

19   false testimony to obtain a conviction - even false testimony that goes only to the credibility of

20   the witness - is "implicit in any concept of ordered liberty." Id. Nevertheless, simple

21   inconsistencies in testimony are insufficient to establish that a prosecutor knowingly permitted

22   the admission of false testimony. United States v. Zuno-Arce, 44 F.3d 1420, 1423 (9th Cir.1995).

23   "Discrepancies in . . . testimony . . . could as easily flow from errors in recollection as from lies."

24   Id.

25          In this case, Petitioner fails to demonstrate that the testimony of the victim was false, let

26   alone demonstrate that the prosecutor knew it to be false. The claim is conclusory, unsupported,

27   and must be denied. James v. Borg, 24 F.3d 20, 26 (9th Cir.1994).

28   ///

1    4.   Ineffective Assistance of Counsel

2         a.   State Court Opinion

3    In his final claim, Petitioner contends defense counsel rendered ineffective assistance by

4    failing to "present evidence to support perjury at trial" and for failing to "put on record"

5    "evidence for petitioner's defense."  Pet. at 10, 20.  This claim was also presented in Petitioner's

6    state habeas petitions.  The Fresno County Superior Court denied the claim as follows:

7        Second, Petitioner argues that he received ineffective assistance of counsel at trial.
         In support of this contention, Petitioner argues that he received ineffective
8        assistance when his attorney failed to challenge the introduction of allegedly
         perjured testimony presented by Antoinette Ramirez or present any evidence in his
9        defense.

10       However, in order to demonstrate ineffective assistance of counsel, Petitioner must
         allege facts showing that (1) his counsel's representation fell below an objective
11       standard of reasonableness, and (2) that his defense suffered prejudice as a result.
         (*Strickland v. Washington* (1984) 466 U.S. 668, 690-92.)  In the present case,
12       Petitioner has failed to provide any facts or evidence that would establish a
         reasonable probability that the result of his criminal proceeding would have been
13       more favorable had his attorney objected to allegedly perjured testimony presented
         by Antoinette Ramirez or presented unspecified evidence in his defense.  (See *In
14       re Cox* (2003) 30 Cal.4th 974, 1019-20 [stating that court may dispose of
         ineffective assistance of counsel claim if petitioner has not demonstrated sufficient
15       prejudice without deciding if counsel's performance was deficient].)  Indeed, he
         does not even specify what legal objection might have been raised to the testimony
16       of Antoinette Ramirez, nor does he identify what evidence his counsel failed to
         present in his defense.  Consequently, Petitioner has failed to demonstrate that he
17       received ineffective assistance of counsel.

18   (LD 15 at pp. 2-3.)

19        b.   Federal Standard

20   Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth

21   Amendment.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of

22   counsel are reviewed according to Strickland's two-pronged test.  Miller v. Keeney, 882 F.2d

23   1428, 1433 (9th Cir. 1989) (citing Strickland v. Washington, 466 U.S. 668 (1984)); United States

24   v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75(1988) (holding

25   that where a defendant has been actually or constructively denied the assistance of counsel

26   altogether, the Strickland standard does not apply and prejudice is presumed; the implication is

27   that Strickland does apply where counsel is present but ineffective).

28   To prevail, Petitioner must show two things.  First, he must establish that counsel's

19

1   deficient performance fell below an objective standard of reasonableness under prevailing

2   professional norms.  Strickland, 466 U.S. at 687-88.  Second, Petitioner must establish that he

3   suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional

4   errors, he would have prevailed on appeal.  Id. at 694.  A "reasonable probability" is a probability

5   sufficient to undermine confidence in the outcome of the trial.  Id.  The relevant inquiry is not

6   what counsel could have done; rather, it is whether the choices made by counsel were reasonable.

7   Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

8       With the passage of the AEDPA, habeas relief may only be granted if the state-court

9   decision unreasonably applied this general Strickland standard for ineffective assistance.

10  Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).  Accordingly, the question "is not whether a

11  federal court believes the state court's determination under the Strickland standard "was incorrect

12  but whether that determination was unreasonable–a substantially higher threshold."  Schriro v.

13  Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123.  In effect, the AEDPA standard

14  is "doubly deferential" because it requires that it be shown not only that the state court

15  determination was erroneous, but also that it was objectively unreasonable.  Yarborough v.

16  Gentry, 540 U.S. 1, 5 (2003).  Moreover, because the Strickland standard is a general standard, a

17  state court has even more latitude to reasonably determine that a defendant has not satisfied that

18  standard.  See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)("[E]valuating whether a rule

19  application was unreasonable requires considering the rule's specificity.  The more general the

20  rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

21              c.    Analysis

22      Petitioner fails to present sufficient facts or evidentiary support to rebut the presumption

23  that counsel rendered effective assistance.  Petitioner fails to state the basis on which defense

24  counsel could have objected to the victim's testimony, and he fails to identify any evidence that

25  he claims counsel should have presented.  His claim is completely conclusory, speculative, and

26  must be denied.

27  **IV.    CERTIFICATE OF APPEALABILITY**

28      In addition to denying the petition, the Court finds it must decline to issue a certificate of

20

1    appealability.  A state prisoner seeking a writ of habeas corpus has no absolute entitlement to

2    appeal a district court's denial of his petition, and an appeal is only allowed in certain

3    circumstances.  Miller-El v. Cockrell, 537 U.S. 322, 335-336 (2003).   The controlling statute in

4    determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as

5    follows:

6          (a)      In a habeas corpus proceeding or a proceeding under section 2255 before a district
             judge, the final order shall be subject to review, on appeal, by the court of appeals for the
7          circuit in which the proceeding is held.

8          (b)      There shall be no right of appeal from a final order in a proceeding to test the
             validity of a warrant to remove to another district or place for commitment or trial a
9          person charged with a criminal offense against the United States, or to test the validity of
             such person's detention pending removal proceedings.
10
      (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may
11     not be taken to the court of appeals from—

12          (A) the final order in a habeas corpus proceeding in which the detention
               complained of arises out of process issued by a State court; or
13
            (B) the final order in a proceeding under section 2255.
14
      (2) A certificate of appealability may issue under paragraph (1) only if the applicant has
15     made a substantial showing of the denial of a constitutional right.

16     (3) The certificate of appealability under paragraph (1) shall indicate which specific issue
        or issues satisfy the showing required by paragraph (2).
17

18          If a court denies a petitioner's petition, the court may only issue a certificate of

19    appealability when a petitioner makes a substantial showing of the denial of a constitutional right.

20    28 U.S.C. § 2253(c)(2).  To make a substantial showing, the petitioner must establish that

21    "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have

22    been resolved in a different manner or that the issues presented were 'adequate to deserve

23    encouragement to proceed further.'"  Slack v. McDaniel, 529 U.S. 473, 484 (2000) (quoting

24    Barefoot v. Estelle, 463 U.S. 880, 893 (1983)).

25          In the present case, the Court finds that Petitioner has not made the required substantial

26    showing of the denial of a constitutional right to justify the issuance of a certificate of

27    appealability.  Reasonable jurists would not find the Court's determination that Petitioner is not

28    entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to

proceed further.  Thus, the Court DECLINES to issue a certificate of appealability.

## V.    ORDER

Accordingly, the Court **ORDERS**:

1)  The petition for writ of habeas corpus is **DENIED**;

2)  The Clerk of Court is **DIRECTED** to enter judgment and close the case; and

3)  The Court **DECLINES** to issue a certificate of appealability.

IT IS SO ORDERED.

Dated:   __**March 9, 2017**__                      _____**/s/ Jennifer L. Thurston**
                                              UNITED STATES MAGISTRATE JUDGE